IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Criminal Case No. 10 Cr. 336 (LAK) |
| ) | |
| **PAUL TATE** ) | |

**SENTENCING MEMORANDUM
ON BEHALF OF DEFENDANT PAUL TATE**

WILLIAMS & CONNOLLY LLP
David M. Zinn (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Beth A. Stewart (*pro hac vice*)
1350 Corcoran St., N.W. #503
Washington, D.C. 20009
(202) 434-5075

*Attorneys for Paul Tate*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PERSONAL BACKGROUND..............................................................................................2

    1.    Mr. Tate's Upbringing ..................................................................................2

    2.    Family ............................................................................................................3

    3.    Community ...................................................................................................4

EMPLOYMENT AT POKERSTARS....................................................................................6

SENTENCING GUIDELINES...............................................................................................8

ARGUMENT...........................................................................................................................9

CONCLUSION......................................................................................................................13

**INTRODUCTION**

Paul Tate, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing.

We write to request that the Court exercise its discretion to impose a sentence of time served in this online poker case. This is within the Stipulated Guidelines Range of 0-6 months provided by the parties' plea agreement. Mr. Tate's personal history, his family circumstances, the nature of the offense, and his role as a minor participant (which the government acknowledges) all counsel in favor of such a sentence. Such a non-custodial sentence would also be consistent with other sentences in this District for similarly-situated defendants, 100% of whom have received sentences of probation. *See* Ex. 2 at 4 (MCM Consulting Memorandum).

Mr. Tate comes before the Court as a dedicated husband, devoted father of two young children, loyal son, and an individual with deep and longstanding commitments to his extended family, co-workers, and friends. He is a citizen of the United Kingdom ("U.K.") who lives on the Isle of Man (a small island, part of the U.K, located in the Irish Sea between the U.K. and Ireland). Prior to coming to New York voluntarily in July 2016 to seek to resolve this matter, Mr. Tate had spent only 1-2 days in his entire life in the United States (unrelated to this matter). He came to New York over this past summer, rented an apartment, and has been here since that time, solely for the purpose of addressing these charges.

Mr. Tate has pled guilty to the offense of having worked for a gambling operation, PokerStars (the "Company"), an Isle of Man company that offered online poker games to players around the world. The Company was licensed and operated legally in many different European and other jurisdictions. Originally hired to work on information technology issues, Mr. Tate was

1

assigned in 2008 to a position that involved interaction with U.S. payment processors (companies that processed payments to and from online players over the internet).

Unlike others who have come before the Court, Mr. Tate was neither a founder of, nor a senior executive at, a poker company. Nor did he have any say in the strategic decisions at PokerStars to operate or remain in the U.S. In fact, Mr. Tate's job at PokerStars was not focused on the United States until he was assigned some new responsibilities in 2008, following the departure of another employee.

In light of the sentencing factors prescribed by 18 U.S.C. § 3553, as outlined below, we respectfully request that the Court impose a non-custodial sentence.

## PERSONAL BACKGROUND

Paul Tate has lived a life characterized by hard work, generosity, compassion, and loyalty to family and friends. He had a working class childhood, earned a scholarship to attend secondary school, went on to study at college, and worked in various mid-level manager positions with a technology focus, all in Europe. He and his wife, his partner of 17 years, have two small children they are raising on the Isle of Man, where they have lived for the past decade.

We summarize here some of the pertinent facts most relevant to sentencing. That said, individuals from across the world have taken the time to express their support for Mr. Tate in letters attached to this Sentencing Memorandum at Exhibit 1.[1] These testimonials best describe Mr. Tate's character.

### 1.     Mr. Tate's Upbringing

Mr. Tate, 43, was born in 1973 and grew up near Manchester, England. His mother, a single parent, worked in the textile industry as a machinist. *See* Ex. 1 at 18 (Letter of Elizabeth

---

[1] Pursuant to Federal Rule of Criminal Procedure 49.1 ("Privacy Protection For Filings Made with the Court"), home addresses and minors' names have been redacted.

Tate). Mr. Tate never met his father. Paul and his mother shared a single room in his grandparents' house until he was eight years old. He and his mother then moved into public housing and eventually into a small home. Mr. Tate worked throughout his adolescence, including at a supermarket, to help support himself and his mother. *See id*. at 18-19.

Mr. Tate earned a government scholarship for secondary school and ultimately attended the University of Leeds, where he studied French and German. Throughout his studies, he continued to work to support the household. At Leeds, he took a class related to the internet, which sparked his interest in technology work. Following graduation, Mr. Tate held jobs in the technology field in multiple cities in the European Union, including Amsterdam and Stockholm. He worked at Stream International (an outsourced technology partner for HP), Amsterdam RIPE NCC (a not-for-profit membership organization acting as a Regional Internet Registry), UUNet (an early Internet service provider that is now part of Verizon), and in customer service for the Swedish gaming company Ongame e-solutions, AB, before taking a job at PokerStars in 2006.

**2.   Family**

Mr. Tate's life revolves around his wife, two little boys, elderly mother, and extended family. Mr. Tate met his wife, Helen, in 1999 in Vienna, Austria. *See* Ex. 1 at 21 (Letter of Helen Tate). After several years in continental Europe, they moved to the Isle of Man in 2006, married, and started their family. Their son R.T. was born in March 2009; he is now seven years old. Two years later, their son Z.T. was born; he is now five.

Mr. Tate is a devoted father. As his wife writes:

> Having grown up without knowing his own father, Paul is very aware of the importance of spending quality time with the children and the need to be there for them. As a father, Paul is loving, fun, and very happy to spend time playing with our children, including teaching them right from wrong and making them giggle and laugh.

*Id*.  Mr. Tate takes part in the children's daily activities—"giving them a bath, putting them to bed, making them food," or just enjoying "a jump on the trampoline" or "a hide and seek adventure."  *Id*.  Mr. Tate also takes the boys to weekly soccer practice and to the Beavers, the junior section of the Scouts.  *Id*. at 22.  Mr. Tate "is a doting father who loves and take great pride in his kids . . . ."  Ex. 1 at 7 (Letter of Jeffrey Haas).  "[R.T.] and [Z.T.] have, themselves, become caring children who look out for one another as well as their friends.  They are their father's sons."  Ex. 1 at 14 (Letter of Gareth George McIntosh).

Mr. Tate has similarly close relationships with other family members.  He provides financial support to his mother.  *See* Ex. 1 at 19-20 (Letter of Elizabeth Tate).  He is also close with Helen's family.  As his sister-in-law describes their early relationship:  "Even though we [spoke] different languages Paul stepped right into our hearts and immediately became a natural part of our family."  Ex. 1 at 4 (Letter of Ulrika Dagérus).  Naturally gifted with languages, Mr. Tate quickly learned Swedish to better communicate with his in-laws.  As his father-in-law notes:  "Paul is gentle, kind and very thoughtful.  He always wants to help."  Ex. 1 at 3 (Letter of Kenth Dagérus).  Whenever his in-laws visit, Mr. Tate plans activities for them and "makes marvelous vegetarian food."  *Id*.  And he has taken on a mentorship role in his sister-in-law's life, guiding her through the resume-building and job application process.  *See* Ex. 1 at 4 (Letter of Ulrika Dagérus).  In a nutshell, Mr. Tate "is a wonderful man who is deeply dedicated to his family."  Ex. 1 at 3 (Letter of Kenth Dagérus).

3. **Community**

Mr. Tate is similarly supportive of his community.  As Bryan Lomax explains:  "I was fortunate enough to meet Paul Tate over twenty six (26) years ago and have known him as a close friend ever since that first day . . . .  [H]e was always willing to give up his time to help those in need."  Ex. 1 at 12 (Letter of Bryan Lomax).  During his time at Leeds, Mr. Tate would

travel long distances on weekends to help Mr. Lomax run charity events at the Bolton Institute of Higher Education Students Union. *See id*. Mr. Tate continued to assist Mr. Lomax well into adulthood, mentoring both of his children. *See id*. During difficult periods in Mr. Lomax's life, Mr. Tate helped cover the cost of schooling and legal fees for his loved ones. Mr. Lomax writes:

> Paul voluntarily stepped in to assist us during our time of need. . . . I have the utmost respect for Paul. I am proud of him and his achievements, his help with my family, and most importantly proud to call him a friend.

*Id*. at 13.

Former co-worker Farid Harzallah describes Mr. Tate's willingness to assist others at work, even when it was not to his advantage. *See* Ex. 1 at 8 (Letter of Farid Harzallah). "I remember Paul being a person who people could turn to for help and as being a person who could be trusted and relied on." *Id*. On a more personal level, Mr. Tate babysat Mr. Harzallah's children so that he and his wife could spend some time together. During Mr. Harzallah's later divorce, Mr. Tate was there for him, offering him a place to stay. *See id*. Neal Clague also writes that Mr. Tate provided a roof over his head during his separation from his wife. *See* Ex. 1 at 2 (Letter of Neal Clague). "It really saved me from a very slippery path and being able to talk through my issues with Paul really helped me to stay positive during an unpleasant time in my life." *See id*. And after Mr. Clague lost a close friend, Mr. Tate paid for his flight home to attend and speak at the funeral. *See id*. Mr. Tate was likewise there for Jeffrey Haas when he lost his mother: Mr. Tate regularly checked in on Mr. Haas after her passing, and "was visibly moved after her death, even though he never met her, as he understood how significant a presence she had" in Mr. Haas's life. Ex. 1 at 7 (Letter of Jeffrey Haas).

Mr. Tate "and his family have a welcoming and kind manner." Ex. 1 at 11 (Letter of Steven Humphries). As a former colleague put it, Mr. Tate "is the kind of pal your Mum always

5

likes to meet." *See* Ex. 1 at 2 (Letter of Neal Clague). "There genuinely needs to be more people like Paul in the world." Ex. 1 at 14 (Letter of Gareth George McIntosh). "I know the saying goes 'you can't choose your family.' But, if I could, I would without a doubt choose Paul as my brother." Ex. 1 at 13 (Letter of Bryan Lomax).

## EMPLOYMENT AT POKERSTARS

PokerStars, founded in 2001, offers online poker games to customers over the internet. By the time Mr. Tate applied for a position in 2006, PokerStars had grown into a mature company operating in multiple countries. It offered online poker in many jurisdictions with established licensing regimes for online gaming, including Malta, Italy, France, Spain, Belgium, and Denmark.

Unlike other companies that are the subject of the Superseding Indictment, there is no allegation that PokerStars mishandled player funds or defrauded its customers. Whereas other poker companies collapsed after the indictments in this matter, PokerStars immediately repaid all U.S. player funds. The Company has since been sold and continues to be the largest online poker company in the world, utilized legally by hundreds of thousands of customers in countries outside of the United States. PokerStars also now operates in New Jersey pursuant to that state's licensing regime for online poker.

Mr. Tate's hiring at PokerStars was routine and similar to his experience with prior employers. He formally applied for the job and was interviewed for the position. He negotiated the terms of an employment contract. He was hired to focus on technical project management issues.

Mr. Tate's responsibilities at PokerStars focused on technology-related issues—ensuring that payment transactions were processed successfully, that the IT systems of payment

6

processors and PokerStars communicated accurately, that error messages could be resolved, and that customer deposits could be taken and payments made to customers through the Company's IT systems.

In late 2007, Mr. Tate was assigned to take on the job of identifying and engaging potential payment processors in Europe, subject to direction from senior management. Like his earlier role, this position focused on non-U.S. activity. In late 2008, Mr. Tate was assigned to carry out similar responsibilities with respect to U.S. processors, taking over part of the workload of a departing employee. Even then, the U.S. processing portfolio formed only one part of his overall responsibilities.

Mr. Tate did not set policy or strategic direction for the Company, much less strategy relating to the U.S. business. PokerStars offered its services to the U.S. market before Mr. Tate was employed there. He had no role in the Company's decision to accept U.S. players, nor in its decision to continue to offer services to U.S. players over time. In fact, Mr. Tate never had any senior management role whatsoever. Mr. Tate was not on the Executive Committee; he was not on the Company Board; he was not a department head (paragraph 8 of the Superseding Indictment inaccurately described his position); and he was not a founder of the Company.

Nonetheless, Mr. Tate admits that it was wrong to remain at PokerStars, particularly after he was assigned to interact with the U.S. business. As he told Probation Services, when his job evolved to include that function, he should have quit and done something else. Regrettably, he did not do so, and this now brings him before the Court.

PokerStars exited the U.S. market at the time of the Superseding Indictment (it later obtained a license to offer its services in New Jersey). Mr. Tate remained there until July 2014. At that time, the Company, which had been sold to a third party, severed his employment.

7

**SENTENCING GUIDELINES**

Although the Sentencing Guidelines are advisory only, the Court should "'begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'" *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). As set forth in the plea agreement, Mr. Tate's Guidelines range is 0 to 6 months.

Applying the November 2010 Guidelines Manual,[2] Mr. Tate's base offense level is 12. *See* U.S.S.G. § 2E3.1 ("Gambling Offenses"). The plea agreement stipulates that there should be two level reduction because Mr. Tate was a minor participant in the criminal activity. *See* U.S.S.G. § 3B1.2(b); *supra* at pp. 6-7. Assuming Mr. Tate "clearly demonstrates acceptance of responsibility for his offense" at sentencing, an additional two-level reduction would be warranted. U.S.S.G. § 3E1.1(a). Accordingly, the applicable Guidelines offense level under the plea agreement is 8. Mr. Tate has no criminal history and therefore zero criminal history points; his Criminal History Category is I. The corresponding Guidelines range is 0-6 months and the fine range is $1,000 to $10,000. U.S.S.G. §§ 5A, 5E1.2(c)(3). Because the applicable guidelines range is in Zone A of the Sentencing Table, the Guidelines permit the imposition of a sentence of probation. U.S.S.G. § 5B1.1.

---

[2] Section 1B1.11 of the Sentencing Guidelines provides that the Court should apply the guidelines in effect at the time of sentencing unless the application would violate the *ex post facto* clause. U.S.S.G. § 1B1.11(b) (2016). The *ex post facto* clause is violated "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." U.S.S.G. § 1B1.11 application note 2 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2078 (2013)). Because the current Guidelines provide for a higher fine range than the range in place at the time of this offense, the Court should apply the November 1, 2010 version of the Guidelines (fine range of $1,000 to $10,000) in this matter. *See* U.S.S.G. § 1B1.11 application note 2. Aside from the differences in the fine range and some exemplary commentary, the relevant current Guidelines are substantively the same as those that were effective November 1, 2010.

**ARGUMENT**

A court's overarching duty is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a); *see United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015) (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007)).  The section 3553(a) factors strongly support a sentence of time-served, which is within the guidelines range.

**First**, as the government has recognized, Mr. Tate was a minor participant in the conduct at issue in this matter.  As noted above, he had no involvement in, or authority over, the decision to have PokerStars enter or remain in the U.S. market.  Indeed, he had no role in any aspect of the strategic direction of PokerStars.  He is therefore differently situated than other poker company defendants in this matter.  Mr. Tate was not a founder, senior executive, department head, Executive Committee member, or Board member of an online poker company.  To the contrary, he was an employee who came to PokerStars in a technical role that was not focused on the U.S., only to be subsequently assigned to interact with U.S. processors following a personnel change at the Company in 2008.

Mr. Tate entered a plea to an IGBA violation for conducting a gambling business in violation of U.S. law.  18 U.S.C. § 1955(a).  As he noted at his plea hearing, he has admitted his guilt and deeply regrets his actions.  *See* D.E. 347 at 19:6-11 (Plea Hr'g Tr., 10/13/2016).  But he is demonstrably different from the other defendants who have come before this Court in light of his relatively lower position within the Company.  *Cf.* 18 USC § 3553(a)(1), (a)(2)(A) (sentence should reflect the "nature and circumstances of the offense" and its "seriousness").

**Second**, Mr. Tate received no economic benefit as a result of his U.S.-related work.  His compensation was roughly the same both before and after the U.S. assignment.  He received no different bonus following the assignment.  The assignment did not represent a promotion.

9

As the court is aware, Mr. Tate consented to the forfeiture of $119,000 in connection with his plea. (Indeed, he has already paid this sum.) But that number was not based on the fact that Mr. Tate received any special compensation for U.S.-related work. Rather, the forfeiture number was derived by deducting from his 2008-10 compensation a pro rata amount based on the percentage of U.S. revenues that *PokerStars*—not Mr. Tate—received during that period in relation to overall Company revenues.

The fact that Mr. Tate received no economic benefit tied to U.S.-related work distinguishes Mr. Tate from others in this matter who stood to benefit personally from poker activity in the United States. *See* D.E. 182 at 3, 4 (Gov't Sentencing Mem. for Defendant Campos, noting benefits received for his involvement); D.E. 238 at 2 (Gov't Mem. of Law for Defendant Elie, noting misappropriation of funds).

**Third**, there are some mitigating—though not exonerating—circumstances under which Mr. Tate carried out his job responsibilities. Mr. Tate accepted a (non-U.S.-focused) position at a company that appeared to have a strong culture of compliance. The Company had legal and compliance departments. Although headquartered on the Isle of Man, the Company's in-house counsel's office included a U.S.-trained lawyer. In addition, the Company engaged many prominent outside U.S. lawyers to opine on its operations, including a former Assistant United States Attorney from the Southern District of New York, a highly-acclaimed U.S. Supreme Court practitioner, and a law firm run by a former United States Attorney General. Moreover, it is not disputed that PokerStars operated legally in many jurisdictions throughout the world, and was licensed and regulated in many European countries. Because IGBA nevertheless makes it unlawful to conduct a business that is operating in violation of state gambling laws in the United

10

States, *see United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997), these factors are not exonerating. They do, however, provide important context relevant to sentencing.

**Fourth**, a non-custodial sentence is appropriate in light of Mr. Tate's personal characteristics. He has been a devoted husband, father, son, and friend. He has lived a modest life, pulling himself up from a challenging childhood and treating people generously and with great empathy regardless of his personal situation. Indeed, during the difficult time of this investigation, he has supported his wife's pursuit of a master's degree and focused on being an attentive, nurturing father. *See* 18 U.S.C. § 3553(a)(1) (sentence should consider the "history and characteristics of the defendant"). He has treated people well and fairly. Here, where the Guidelines range already includes a non-custodial sentence, it is appropriate for the Court to exercise its discretion to impose such a sentence.

**Fifth,** imprisonment is not necessary to "afford adequate deterrence" to Mr. Tate, *see* 18 U.S.C. § 3553(a)(2)(B), or to "protect the public from further crimes" by him, *id.* § 3553(a)(2)(C). A term of imprisonment would provide no additional deterrent value. *See United States v. Cosimi*, 368 F. Supp. 2d 345, 359 (S.D.N.Y. 2005) (imposing sentence at the lowest end of the Stipulated Guidelines Range based in part on defendant's "low danger of recidivism"). Mr. Tate has suffered, and will continue to suffer, immense consequences as a result of his indictment. He has been essentially unemployed for two years, other than having an infrequent minor consulting job or working on his own potential business projects. Saddled with a felony plea, his future employment prospects are highly uncertain. Moreover, because the tiny Isle of Man has a small-community culture, Mr. Tate's participation in this crime—including the news of his October 13 plea—has been publicly reported, and he and his family have had to bear the

11

shame of this plea.  There is no likelihood of recidivism; indeed, Mr. Tate has no criminal history.

**Sixth**, a non-custodial sentence would be consistent with those imposed on similarly situated defendants.  *See* 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  Data kept by the United States Sentencing Commission shows 100% of the defendants in the Southern District of New York similarly situated to Mr. Tate—insofar as they pleaded guilty to 18 U.S.C. § 1955 and had an identical Guidelines calculation—sentenced between October 1998 and September 30, 2015 received probationary sentences.  *See* Ex. 2 at 4 (MCM Data Consulting Memorandum).  Nationwide, 95% of similarly situated defendants received probationary sentences.  *Id.*

**Finally**, in light of Mr. Tate's citizenship, there are equitable factors that counsel in favor of a non-custodial sentence.  Inmates who are not U.S. citizens cannot be incarcerated at minimum-security facilities, also known as federal prison camps.  Bureau of Prisons, *Program Statement P5100.08: Inmate Security Designation and Custody Classification*, Chapter 5, p. 9 (Sept. 12, 2006), https://www.bop.gov/policy/progstat/5100_008.pdf.[3]  Accordingly, any term of incarceration would have a disproportionately harsher impact on Mr. Tate, as he would serve custodial time in a secure prison with inmates whose behavior implicates public safety factors outlined by the Bureau of Prisons.  *Id.* at Chapter 5, p. 12.

\* \* \* \*

Mr. Tate has suffered grave consequences as a result of his work for PokerStars.  His livelihood has been shattered. "He will need to start in a new career in a new sector in his 40s

---

[3] A sentencing court can consider alienage if "its effect is beyond the ordinary." *United States v. Restrepo*, 999 F.2d 640, 644 (2d Cir. 1993).

once this is resolved – something that is going to prove difficult at best." Ex. 1 at 7 (Letter of Jeffrey Haas). He has been separated from his home for four months, appearing here voluntarily (despite the absence of an extradition remedy) to face the charges. In short, "[a]n incarceratory Guidelines sentence . . . will deprive [Mr. Tate's] family of vital financial and emotional support while doing little to further protect the public," as well as "unnecessarily add to taxpayers' burdens." *United States v. E.L.*, No. 15-CR-137, 2016 WL 2939152, at *2 (E.D.N.Y. May 19, 2016).

## CONCLUSION

For the foregoing reasons and those expressed in the letters included with this submission from the family members, friends, and colleagues who know him best, Mr. Tate respectfully asks the Court to impose a non-custodial sentence of time-served, within the Stipulated Guidelines Range, and permit him to return home.

November 14, 2016                                       Respectfully submitted,

                                                        By:     /s/ *David M. Zinn*
                                                                WILLIAMS & CONNOLLY LLP
                                                                David M. Zinn (*pro hac vice*)
                                                                725 Twelfth Street, N.W.
                                                                Washington, D.C. 20005
                                                                (202) 434-5000

                                                                Beth A. Stewart (*pro hac vice*)
                                                                1350 Corcoran St., N.W. #503
                                                                Washington, D.C. 200009
                                                                (202) 434-5075

                                                                *Attorneys for Defendant Paul Tate*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2016, I electronically filed the foregoing Sentencing Memorandum on behalf of Defendant Paul Tate using the CM/ECF system, which will send notification of such filing to counsel of record.

                                                                */s/ David M. Zinn*

                                                                David M. Zinn